IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

**STATE OF TENNESSEE v. SCOTT ALAN HAYNES, JR.**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2021-CR-742      William R. Goodman, III, Judge**

———————————————————

**No. M2024-00851-CCA-R3-CD**

———————————————————

The Defendant, Scott Alan Haynes, Jr., was convicted in the Montgomery County Circuit Court of second degree murder and reckless endangerment committed with a deadly weapon and received consecutive eighteen- and two-year sentences, respectively. On appeal, the Defendant claims that the evidence is insufficient to support his second degree murder conviction and that his eighteen-year sentence for the conviction is excessive. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and KYLE A. HIXSON, J., joined.

Chase T. Smith (on appeal and at trial), Clarksville, Tennessee, for the appellant, Scott Alan Haynes, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert J. Nash, District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On November 20, 2020, the Defendant shot and killed his sister-in-law's fiancé, Austin Lee Moss. In July 2021, the Montgomery County Grand Jury indicted the Defendant for first degree premeditated murder of Mr. Moss ("the victim") and for reckless endangerment with a deadly weapon of the Defendant's sister-in-law, Jessica Harris, because she was standing near the victim at the time of the shooting. The Defendant went to trial in May 2023.

At trial, Jessica Harris testified that in November 2020, she and the victim had been in a romantic relationship for seven months and lived in Texas. Ms. Harris had a three-year-old daughter from a previous relationship and was pregnant with the victim's child. Ms. Harris's sister, Kristen Haynes, was married to the Defendant, and they had a young daughter and lived in Clarksville, Tennessee. Ms. Harris and Mrs. Haynes had a close relationship, and Mrs. Haynes suggested that Ms. Harris and the victim move in with Mrs. Haynes and the Defendant until Ms. Harris and the victim "got up on [their] feet." Seven days before the shooting, Ms. Harris, her daughter, and the victim moved into the home of Mrs. Haynes and the Defendant. Ms. Harris said that everyone was getting along and that there were no confrontations between the Defendant and the victim.

Ms. Harris testified that on the night of November 20, she and Mrs. Haynes were going to spend time together while "the guys were going to have a good time in the basement." She said that by "good time," she meant the victim and the Defendant were going to play "video games, as well as other drinking games." Another man, Jonathan "J.T." Owens, was in the basement with the Defendant and the victim.

Ms. Harris testified that she and Mrs. Haynes went downstairs into the basement and that she saw all three men consuming alcohol. The State asked what the men were drinking, and Ms. Harris said, "I know I saw Crown, . . . and then [the victim] had some beer." Ms. Harris was concerned about the victim's consuming alcohol, and she told the Defendant that the victim "didn't handle clear liquor very well" and that the victim "needed to slow down." The Defendant responded, "'I can handle it.'"

Ms. Harris testified that at some point, both couples went upstairs to the main floor of the home to check on their daughters while Mr. Owens remained in the basement. The victim came out of a bedroom and saw the Defendant "disciplining" one of the Defendant's dogs in the kitchen. The victim, who loved animals, "attempted to step in front." The Defendant told the victim, "'You're not going to tell me what to do in my own house.'" The Defendant punched the victim's face and put the victim in a chokehold on the floor. The victim struggled and "started to turn purple and his arms steadily started to fall to his sides." Ms. Harris, Mrs. Haynes, and Mr. Owens forced the Defendant to release the victim, and the Defendant kicked the victim's head. Ms. Harris stated, "I felt it was kind of low that he kicked him after he had just put him into a chokehold and he almost lost consciousness."

Ms. Harris testified that the Defendant ordered the victim to leave the house. The victim yelled at the Defendant, and the Defendant said, "'I'm going to shoot him.'" The Defendant ran down the stairs from the kitchen to the basement, and Mrs. Haynes went with him. The victim tried to follow the Defendant and walked down three or four steps.

- 2 -

However, the victim stopped when he saw the Defendant holding a handgun. Ms. Harris said that she was standing "almost right next to" the victim and that she was trying to push him back up the stairs. The Defendant's arm was extended, and he was trying to find a flashlight that was mounted on the gun. When he found the light, he pulled the trigger and shot the victim in the chest. Ms. Harris acknowledged that the victim was "backing up the stairs" at the time of the shooting.

Ms. Harris testified that the victim fell and that he slid down one or two steps. Ms. Harris heard the Defendant make a telephone call and heard him say that he had just shot someone and that he had disassembled the weapon. Ms. Harris called 911, tried to stop the victim's bleeding, and tried to keep him awake. The victim never said anything to Ms. Harris after the shooting.

On cross-examination, Ms. Harris acknowledged that she and the victim moved to Clarksville "to get out of a bad family situation" with the victim's family and that they had to leave Texas "kind of in a hurry." The victim had been jailed previously for domestic assaults, but none of those incidents involved Ms. Harris. Ms. Harris had heard from other people that the victim had been diagnosed with schizophrenia, but she did not have any direct knowledge of that diagnosis. Mrs. Haynes and the Defendant did not know the victim when Mrs. Haynes invited Ms. Harris and the victim to move to Clarksville.

Ms. Harris testified that the shooting occurred about 10:00 p.m. and that the altercation in the kitchen began when the victim saw the Defendant chasing one of the Defendant's dogs. Ms. Harris did not see the Defendant hit the dog, but the victim intervened and told the Defendant, "'Please don't hurt the dog.'" The victim's statement angered the Defendant, and the two men began fighting physically. Ms. Harris acknowledged that the Defendant put the victim in a "rear chokehold" and that the Defendant said the victim had to leave the house by midnight. Ms. Harris tried to get the victim to leave, but he kept yelling at the Defendant. The Defendant said he was going to shoot the victim and went into the basement. The victim headed into the basement after the Defendant. Ms. Harris acknowledged that the victim had a rifle in the basement and that she got in front of him to try to stop him from going downstairs. The victim went down two or three steps but "froze" when he saw the Defendant holding the handgun. Ms. Harris said the victim "was starting to walk backwards" when the Defendant shot him.

On redirect-examination, Ms. Harris acknowledged that she did not have any direct knowledge of the victim's prior domestic assaults. The Defendant was the first aggressor in the kitchen, but both men were yelling at each other. Ms. Harris acknowledged that the basement had an outside door, and that the Defendant could have left the house through the basement. On recross-examination, Ms. Harris denied that the victim threatened the

- 3 -

Defendant. Defense counsel asked if the victim told the Defendant, "'I'll shoot you back,'" and Ms. Harris said she did not remember what the victim said to the Defendant.

Officer Clint Sutton of the Clarksville Police Department ("CPD") testified that on the night of November 20, 2020, he responded to a shooting at a home on Blakemore Road. A woman met him at the mailbox at the end of the driveway and "explain[ed] the circumstances of the shooting." Officer Sutton entered the house through the basement and saw a handgun on a chair at the bottom of the basement stairs. The Defendant told Officer Sutton that he had used the gun in the shooting. The victim was lying on the stairs "between half and probably three quarters of the way from the bottom" and had a gunshot wound to the chest. Officer Sutton moved him in order to render aid. Based on what the woman at the mailbox had told Officer Sutton, Officer Sutton was "under the impression" that the Defendant shot the victim in self-defense. Therefore, he did not place the Defendant in handcuffs.

Sergeant Mary Owens of the CPD testified that she responded to the scene and that Officer Sutton was aiding the victim. The Defendant, who was dressed like a soldier, was sitting on the basement couch. Sergeant Owens noticed a table set up with alcohol and cups. Officer Sutton told Sergeant Owens to detain the Defendant, so Sergeant Owens placed him in handcuffs. On cross-examination, Sergeant Owens acknowledged that she saw several firearms in the basement, including at least one rifle.

Zackary Odom, a paramedic with Montgomery County EMS, testified that he was dispatched to the scene and arrived eight minutes later. A "significant amount" of blood was around the victim, and Mr. Odom was unable to locate a pulse or detect any electrical activity in the victim's heart.

Officer Scott Beaubien of the CPD testified that he processed the basement and kitchen for evidence. He saw liquor and beer bottles in the basement, and the victim was lying on a landing at the bottom of the stairs. The victim had a gunshot wound in his left chest, and a bullet casing was on the floor to the left of his feet. A Beretta nine-millimeter handgun was on a chair. The basement stairs led up to the kitchen, and Officer Beaubien saw what appeared to be a bullet hole in the kitchen ceiling. Using trajectory rods, he was able to show the jury the upward direction of the bullet as it traveled from the victim into the kitchen ceiling. The bullet exited the roof of the house and was not recovered.

Detective Timothy Green of the CPD testified that he entered the basement and noticed "several guns laying around, rifles." The victim was lying on the landing at the bottom of the stairs, and reddish-brown stains were on every step and the kitchen floor. Detective Green collected measurements and prepared a sketch of the basement and kitchen. Notably, the width of the basement stairwell varied from two feet, eight inches to

- 4 -

three feet, one inch. The stairwell was eleven feet, ten inches in length. On cross-examination, Detective Green testified that he did not collect several handguns and rifles from the basement because they were not involved in the shooting.

The State introduced into evidence an Official Firearms Report prepared by Special Agent Forensic Scientist Alex Brodhag and an Official Forensic Biology Report prepared by Special Agent Forensic Scientist Laura Boos of the Tennessee Bureau of Investigation ("TBI"). The Defendant stipulated to the information in the reports. According to the firearms report, Special Agent Brodhag test-fired the Beretta handgun and microscopically compared the test-fired cartridge cases to the cartridge case found on the basement floor near the victim. He concluded that the cartridge case was fired from the handgun. According to the forensic biology report, the blood on the kitchen floor matched the victim.

Dr. Emily Dennison of the Medical Examiner's Office in Nashville testified as an expert in forensic pathology that she conducted the victim's autopsy. The victim was twenty-four years old and had small abrasions on his head, neck, and torso. He sustained a gunshot entrance wound to his left chest. The bullet traveled slightly left to right and slightly upward, struck his right lung and heart, and exited his back. He lost forty-four percent of his blood volume and died within seconds or minutes. The victim's blood was positive for ethanol and metabolites of marijuana, but Dr. Dennison could not say how the ethanol affected the victim's behavior or when he last ingested or smoked marijuana. She concluded that his cause of death was a gunshot wound to the chest and that his manner of death was homicide. On cross-examination, Dr. Dennison testified that the victim's blood alcohol concentration was 0.213 percent.

Nathan Lee testified that in November 2020, he was a homicide detective with the CPD. In the early morning hours of November 21, he visited the crime scene and interviewed the Defendant at the police department's Special Operations Office. The Defendant told Detective Lee that he had been drinking alcohol before the shooting and that he shot the victim in self-defense. Another detective interviewed Ms. Harris and Mrs. Haynes, and their accounts were very similar to the Defendant's account. However, there were "a couple of discrepancies." First, both women said the victim never mentioned any weapons and never threatened to obtain a weapon. Second, both women said the victim "got the worse end of the deal" during the fight in the kitchen. Detective Lee noted that the Defendant was eight inches taller and thirty pounds heavier than the victim. Therefore, he did not think the victim was a threat to the Defendant's life. The third and most important discrepancy was that both women said the Defendant told the victim, "'If you don't get out of my house, I'm going to shoot you.'" The statement indicated to Detective Lee that the Defendant "already intended to go down there and get his gun to shoot [the victim], if he wouldn't leave." Based on the circumstances of the shooting, Detective Lee decided to charge the Defendant with first degree murder.

Detective Lee acknowledged that the Defendant could have left the house via a door in the basement or one of the upstairs doors. He said that knowledge of the victim's prior charges for domestic assault, the victim's marijuana consumption, or the victim's alcohol consumption would not have affected his decision to charge the Defendant with the crime.

On cross-examination, Detective Lee testified that he did not lie to the Defendant during the interview. However, he asked some questions to which he already knew the answers in order to determine if the Defendant was being truthful. Detective Lee never interviewed Ms. Harris or Mrs. Haynes. After the Defendant's arrest, Detective Lee learned the victim had a rifle in the basement. On redirect-examination, Detective Lee acknowledged that the victim was not armed at the time of the shooting. At the conclusion of his testimony, the State rested its case.

Jonathan Owens testified that he was twenty-six years old and that the Defendant was his "good" friend. At the time of the shooting, Mr. Owens and the Defendant were serving in the same company in the United States Army at Fort Campbell. Mr. Owens later medically retired from the military. At the time of trial, he was living in Georgia.

Mr. Owens testified that on the evening of November 20, 2020, he "showed up" at the Defendant's home to "hang out" with the Defendant and the Defendant's family, which he did often. When he arrived, the four adults and two children were in the home. Mr. Owens had never met Ms. Harris and the victim.

Mr. Owens testified that he and the Defendant were in the basement and that the victim joined them. The Defendant kept his gun in the basement because children were not allowed in there. At some point, the victim "pulled out a hunting rifle." The State asked where the victim put the gun after he handled it, and Mr. Owens said, "I want to say he was keeping it up against the wall down in the basement, before you go towards where the bathroom would be down there, where the bedroom comes off in the back." The Defendant and the victim were consuming alcohol, but there were no problems between them. Mr. Owens said that he had been with the Defendant "plenty of times" when the Defendant was drinking alcohol and that the Defendant was not intoxicated that night. Mr. Owens was unfamiliar with the victim and did not know if he was intoxicated.

Mr. Owens testified that everyone went upstairs while he remained in the basement. He heard the Defendant "getting onto his dog for something" and heard words "exchanged." The Defendant calmly told the victim, "'You know, you're not going to tell me what to do in my house.'" Mr. Owens said that the situation "escalated from there" and that he heard "tussling going on." He went upstairs to the kitchen and saw the Defendant on the Defendant's back and the victim on top of the Defendant. The victim was trying to

hit the Defendant, but the Defendant "had him in a headlock, . . . with his head down, so he couldn't see to do anything" Mr. Owens separated them, and the Defendant told the victim to leave the house. Mr. Owens wanted to get away from the situation, so he returned to the basement, grabbed his coat, and left the residence. He said he did not hear the Defendant or the victim make any threats.

On cross-examination, Mr. Owens testified that law enforcement interviewed him within forty-eight hours of the shooing. He acknowledged telling the police that he saw the Defendant try to hit one of the Defendant's dogs. The Defendant and the victim then got into a physical altercation. Mr. Owens did not know who struck first, but he heard Ms. Harris and Mrs. Haynes screaming for help and saw the victim in a chokehold. He said he did not remember telling the police that the victim could not breathe. After Mr. Owens separated the Defendant and the victim, the victim "was still trying to go at" the Defendant, and the Defendant kicked the victim. Mr. Owens acknowledged telling the police that he had never seen the Defendant "that mad" and that the Defendant "'had already made it up in his mind whatever he was going to do.'" The Defendant ordered the victim to leave the house, but the victim did not want to leave. When Mr. Owens left the house, the victim was sitting on the kitchen floor, Ms. Harris was trying to get the victim to leave the home, and the Defendant was yelling at the victim. Mr. Owens stated that he was staying with the Defendant and the Defendant's family while Mr. Owens was in Tennessee to testify for the Defendant. Mr. Owens said he and the Defendant did not discuss Mr. Owens's testimony.

Kristen Haynes testified that at the time of trial, she and the Defendant had been married almost six years and had two children: a daughter born in July 2018 and a son born in January 2022. In November 2020, Mrs. Haynes's sister, Ms. Harris, was living with the victim and his family in Texas. Ms. Harris told Mrs. Haynes about "a lot of violent altercations at their home," so Mrs. Haynes offered to let Ms. Harris and the victim move in with Mrs. Haynes and the Defendant. Ms. Harris had seen the victim a few times but "didn't really know him." Five days before the shooting, Ms. Harris and the victim moved in with Mrs. Haynes and the Defendant and put all of their belongings in the basement.

Mrs. Haynes testified that on November 20, she got home from work about 7:00 p.m. and that "everybody was hanging out in the basement, watching the football game. Doing a little bit of drinking. Nothing too heavy. And just, you know, a casual Friday night thing with Army people[.]" Everyone but Mr. Owens went upstairs, and one of the dogs urinated on the couch. The dog ran to the back door and "yelped," and the victim yelled, "'Don't hurt the dog. Don't hurt the dog.'" The Defendant went downstairs to be with Mr. Owens and then came back upstairs. He told the victim, "'We're going to squash this right now. You're not going to tell me what to do in my home with my own dog.'" Mrs. Haynes said that the Defendant was "just being stern" and "trying to set a boundary"

with the victim but that the victim "started getting in his face, yelling a whole bunch of profanity."

Mrs. Haynes testified that the victim shoved his chest against the Defendant and that the Defendant "punched" the victim. The victim "got back up, trying to fight back," so the Defendant put the victim in a chokehold to prevent further fighting. Mrs. Haynes and Ms. Harris unsuccessfully tried to separate them, and Mrs. Haynes yelled down to the basement for Mr. Owens. Mr. Owens came upstairs and separated the Defendant and the victim. Mrs. Haynes said they thought everything was going to "cool down," so Mr. Owens left the residence. The Defendant told the victim that the victim was no longer allowed in his home, and Mrs. Haynes told Ms. Harris that Ms. Harris could stay but that the victim had to leave. The victim started "lunging" at the Defendant, yelling, and telling the Defendant that he was "going to beat [the Defendant's] ass." The Defendant said he was going to get his gun if the victim did not leave.

Mrs. Haynes testified that Ms. Harris tried many times to push the victim out of the house. The Defendant went downstairs "to retrieve the weapon." Mrs. Haynes went with him, and the victim followed. The Defendant got his nine-millimeter Beretta and started back up the stairs as the victim was "making his way down the stairs." Ms. Harris was "shoving past" the victim to get between him and the Defendant. Mrs. Haynes told the Defendant to put the gun away, but he did not listen to her. Mrs. Haynes said the Defendant wanted the victim to leave and "felt threatened." A flashlight with a "strobe setting" was mounted on the gun, and the Defendant turned on the strobe light to show the victim that he was not bluffing. The victim continued trying to push past Ms. Harris, so the Defendant shot the victim.

Mrs. Haynes testified that the victim's knees buckled and that he fell backward. The Defendant immediately secured the gun and "called his chain of command" to report the shooting, and Ms. Harris called 911. Mrs. Haynes had training in first aid and wanted to administer cardiopulmonary resuscitation to the victim. However, Ms. Harris did not want Mrs. Haynes to help, so Mrs. Haynes went outside to wait for first responders.

Mrs. Haynes acknowledged that the basement stairwell was "relatively small." At the time of the shooting, the victim was standing on the third and fourth step from the top, Ms. Harris was on the fifth step, Mrs. Haynes was on the seventh step, and the Defendant was on the platform near the bottom of the stairs. Mrs. Haynes acknowledged that "a significant amount" of alcohol was consumed that night. She said, though, "[Mr. Owens] and [the Defendant] were not very, like, inebriated at all, like, that I could tell at least."

On cross-examination, Mrs. Haynes acknowledged that after the incident with the dog, the Defendant and the victim both "walked off." The Defendant went into the

basement but returned to the kitchen. The Defendant was "irritated" with the victim because the Defendant had not done anything wrong to the dog.

Mrs. Haynes acknowledged that the Defendant "threw the first punch" and that the victim never got an opportunity to hit the Defendant because the Defendant immediately put the victim in a headlock. Mrs. Haynes said she did not remember telling the police that the victim could not breathe. She said that the Defendant also kicked the victim while the victim was on the floor and that she did not remember telling the police that the Defendant kicked the victim's head. Before the Defendant said he was going to shoot the victim, the Defendant repeatedly told the victim to leave. The victim did not threaten to shoot the Defendant but threatened to harm the Defendant physically.

Mrs. Haynes testified that the Defendant kept his gun in a case behind the couch in the basement. She acknowledged that in order to obtain the gun, he had to retrieve the gun case from behind the couch and had to open the case. Mrs. Haynes said that she was still married to the Defendant and that they had not discussed her testimony.

The Defendant testified that he was twenty-seven years old, that he enlisted in the military when he was eighteen, and that he married his wife in August 2017. He became acquainted with Ms. Harris and did not have a problem with his wife's inviting Ms. Harris and the victim to live with them. On November 20, 2020, the Defendant got home from work between 5:00 and 7:00 p.m. That night, he was still wearing his "fatigues" and was in the basement with his friend, Mr. Owens. The Defendant was drinking Crown Royal "straight." The victim came into the basement later, and everyone was having a good time. After a while, the Defendant and his wife went upstairs to check on their daughter. The Defendant's dog used the bathroom on the floor right in front of the Defendant and then "bolted off." The Defendant was not going to beat the dog but was going to "spank" him. The victim, who also had been drinking alcohol, got between the Defendant and the dog and stated, "'[Y]ou're not going to touch the dog in front of me.'" The Defendant "wanted to avoid what ended up happening," so he went downstairs to talk with Mr. Owens. The Defendant explained, "I knew that I was aggravated, so I went down there to get a clear head, before I confronted the issue, because I did not want this to blow out of proportion." When the Defendant went back upstairs, he told the victim, "'You're not going to tell me what to do in my house. We need to set some ground rules.'" The victim became aggressive, started yelling, and said he was going to "kick [the Defendant's] ass" and kill the Defendant.

The Defendant testified that the victim shoved him and that he punched the victim's face. The victim fell down and was "getting up talking [sh*t]," so the Defendant put him in a chokehold. The victim was fighting and was still screaming at the Defendant, so Mr. Owens came upstairs and separated them. The victim threatened to beat up the Defendant,

and the Defendant told the victim to get out of his house. The Defendant then told the victim, "'If you do not leave, I'm going to get my gun.'" The Defendant went downstairs and got his gun case from behind the couch. He opened the case, grabbed the pistol, and racked the slide to load it. The Defendant's wife had come downstairs and was standing near him.

The Defendant testified that he went to the bottom of the stairs and saw the victim entering the stairway from the kitchen. The victim was coming down the stairs toward the Defendant, and Ms. Harris was two steps below the victim. A light was mounted onto the Defendant's pistol, and the Defendant turned on the light so that the victim would know the Defendant had the gun. The Defendant raised the gun and stated, "'If you don't leave, I'm going to shoot.'" The victim took another step down, and the Defendant shot him. The Defendant acknowledged that he was aiming at the victim's chest. After the shooting, the Defendant did not call 911 because he heard Ms. Harris on the telephone with the 911 operator. He engaged the gun's safety switch so the gun could not fire, put the gun on a chair, and waited for police.

On cross-examination, the Defendant testified that he did not remember Ms. Harris's telling him that the victim could not handle clear liquor. After the dog used the bathroom on the floor, the dog ran from the Defendant. The Defendant became angry because the victim interfered with the Defendant's plan to punish the dog, and the Defendant and the victim ended up in a physical altercation. The Defendant denied that he kicked the victim's head but said that he kicked the victim's ribs. The Defendant kicked the victim because Mr. Owens was restraining the Defendant, the victim was advancing toward the Defendant, and the Defendant felt threatened. When the Defendant went into the basement to get his gun, he planned to brandish the weapon so that the victim would leave the house. The Defendant turned on the gun light to make sure the victim saw the weapon, but the victim still came toward him. The Defendant denied that the victim was backing up at the time of the shooting. He also denied that the victim was on the top step. The State asked how the victim's blood got on the kitchen floor, and the Defendant said that the gunshot caused the victim to fall backward. The Defendant acknowledged that instead of obtaining the gun, he could have left the house from the basement and called 911. The Defendant did not check on the victim after the shooting and did not learn until after the shooting that the victim was unarmed.

At the conclusion of the Defendant's testimony, the defense rested its case. During the jury charge, the trial court instructed the jury on self-defense. The jury convicted the Defendant of second degree murder as a lesser-included offense of first degree murder and convicted him of reckless endangerment with a deadly weapon as charged in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his conviction of second degree murder, asserting that he is guilty only of voluntary manslaughter because his fight with the victim caused him to act in an irrational manner. In support of his claim, he notes that he did not have a criminal history, was employed by the United States Army, had a good family, waited for the police to arrive after the shooting, and told the police that he shot the victim. The State argues that the evidence is sufficient to support the conviction. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

In this case, the jury convicted the Defendant of second degree murder as a lesser-included offense of first degree premeditated murder. Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. *See State v. Ducker*,

27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-210(a). "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for [the finder of fact]." *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

Taken in the light most favorable to the State, the evidence established that the Defendant was angry with the victim because the victim interfered when the Defendant tried to discipline the dog. The Defendant went down to the basement to talk with Mr. Owens and calm down. By the Defendant's own testimony, he thought he needed to calm down in order "to avoid what ended up happening." He then returned to the kitchen to confront the victim and told the victim, "You're not going to tell me what to do in my house." The victim became angry, the two men began fighting, and the Defendant ordered the victim to leave. When the victim refused, the Defendant pronounced that he was going to get his gun and shoot the victim. The Defendant went downstairs, armed himself with a handgun, and racked the slide to load the gun. Then, instead of leaving the house through the basement and calling the police, he went to the stairway so that he could go back upstairs to the victim. Meanwhile, the victim headed downstairs to the Defendant. However, the victim froze on third or fourth step when he saw the Defendant, who was at the bottom of the stairs, holding the gun. The Defendant raised the gun, turned on the gun light, aimed for the victim's chest, and shot the victim. Ms. Harris testified that the victim was backing up at the time of the shooting. Therefore, under the circumstances, it was reasonable for the jury to conclude that the Defendant knowingly killed the victim. Since the jury was instructed on the difference between second degree murder and voluntary manslaughter, by convicting the Defendant of second degree murder, the jury necessarily rejected the lesser-included offense of voluntary manslaughter. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). The evidence is sufficient to support the conviction.

## II. Sentencing

The Defendant claims that the trial court erred by not sentencing him to the minimum punishment in the range, fifteen years, for second degree murder because the trial court did not find under mitigating factor (13) that he lacked a criminal history, that he complied with the conditions of his bond for more than two years while awaiting trial, and that he successfully served in the military. The State argues that the trial court acted within its discretion when it imposed the effective eighteen-year sentence. We agree with the State.

At the sentencing hearing, no witnesses testified, but the State introduced the Defendant's presentence report into evidence. According to the report, the Defendant graduated from a Missouri high school in 2014, joined the United States Army in June 2015, and was discharged "other than honorable" in January 2023 due to the charges in this case. In the report, the Defendant described his mental health as "fair" and said he had been on mental health medication since his arrest. The Defendant described his physical health as "good" and said his only complaint was chest pain for which he was seeking treatment. The Defendant stated in the report that he began consuming alcohol when he was nineteen years old and that he last consumed alcohol on the night of the shooting. He also stated that he was not intoxicated at the time of the shooting and that he did not think alcohol played a role in the incident. The Defendant said that he experimented with marijuana in high school but that he stopped using the drug when he joined the Army. The presentence report showed that the Defendant did not have any criminal history. His Strong-R assessment concluded that he had high needs in mental health but that his overall risk to reoffend was low. The State also introduced victim impact statements submitted by the victim's mother and Ms. Harris into evidence.

The Defendant gave a statement in which he apologized to the victim's family and his own family. He also said, "It's not a reflection of my character. It's a lapse of judgment that has landed me here."

Defense counsel argued that the trial court should mitigate the Defendant's sentences because he acted under strong provocation; substantial grounds existed, which tended to excuse or justify the Defendant's criminal conduct, though failed to establish a defense; the Defendant committed the offenses under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his criminal conduct; and the Defendant acted under duress of another person, even though the duress was not sufficient to constitute a defense to the crime. *See* Tenn. Code Ann. § 40-35-113(2), (3), (11), (12). Defense counsel also argued under mitigating factor (13), the "catch-all" factor, that the Defendant's lack of a prior criminal record, his military service, and his not violating the conditions of his bond while awaiting trial should mitigate his sentences. *See* Tenn. Code Ann. § 40-35-113(13) (providing that the trial court may mitigate a sentence based upon "[a]ny other factor consistent with the purposes of this chapter").

The trial court found the following enhancement factors applicable to the Defendant's convictions: (3) the offense involved more than one victim; (9) the Defendant employed a firearm during the commission of the offense; and (10) the Defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(3), (9), (10). In mitigation, the trial court applied factor (11), the Defendant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated [his]

- 13 -

criminal conduct." Tenn. Code Ann. § 40-35-113(11). The trial court stated that it did not find any other mitigating factors applicable.

The trial court noted that the Defendant's range of punishment for second degree murder, a Class A felony, was fifteen to twenty-five years and that his range of punishment for reckless endangerment with a deadly weapon, a Class E felony, was one to two years. *See* Tenn. Code Ann. § 40-35-112(a)(1), (a)(5). The trial court sentenced the Defendant to eighteen years for second degree murder and noted that he would have to serve the sentence at one hundred percent. *See* Tenn. Code Ann. § 40-35-501(i)(2)(B). For reckless endangerment, the trial court ordered that the Defendant serve a concurrent two-year sentence.

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise,* 380 S.W.3d 682, 708 (Tenn. 2012). In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the mitigating and enhancement factors, (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement by the Defendant in his own behalf about sentencing, and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Com'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

*Id*. at § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. *See id*. at § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346.

Initially, though not raised by the Defendant, we note that the trial court misapplied enhancement factor (3), the offense involved more than one victim, because that factor may not be applied to enhance a sentence when a defendant is separately convicted of the offenses committed against each victim. *State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995). In the instant case, the Defendant was separately convicted of second degree murder of the victim and reckless endangerment of Ms. Harris. The trial court also misapplied enhancement factor (10), the Defendant had no hesitation about committing a crime when the risk to human life was high, because that factor is inherent in both second degree murder and reckless endangerment. *State v. Belser*, 945 S.W.2d 776, 792 (Tenn. Crim. App. 1996) (second degree murder); *State v. Letson*, No. E2010-00055-CCA-R3-CD, 2011 WL 3862573, at *6 (Tenn. Crim. App. Aug. 26, 2011) (reckless endangerment), *no perm. app. filed*. Despite the trial court's misapplication of two enhancement factors to the Defendant's conviction of second degree murder, the trial court properly applied enhancement factor (9), the Defendant employed a firearm during the commission of the offense, which justified enhancing his sentence three years above the minimum punishment in the range. *See Bise*, 380 S.W.3d 709-10 (holding that despite the misapplication of an enhancement factor, a sentence "should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute").

Regarding the trial court's failure to apply mitigating factor (13), this court has stated that absence of a prior criminal record may be considered under the "catch-all" provision, but the trial court is not required to do so. *State v. Williams*, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995). Likewise, a trial court does not have to consider a defendant's not violating bond conditions. *See State v. Miller*, No. W2023-01128-CCA-R3-CD, 2024 WL 2698894, at *6 (Tenn. Crim. App. May 24, 2024) (the trial court gave "some weight" in mitigation for compliance with bond conditions), *perm. app. denied* (Tenn. Oct. 25, 2024); *but see State v. Garrison*, No. 0LC0L-9407-CC-00236, 1995 WL 555067, at *5 (Tenn. Crim. App. Sept. 20, 1995) (stating that the legislature did not intend

for compliance with bond conditions to be a mitigating factor because a defendant is not expected to violate the terms and conditions of bond), *perm. app. denied* (Tenn. Feb. 26, 1996). As for mitigation for the Defendant's military service, we note that he was dishonorably discharged from the United States Army due to the charges in this case. In any event, "this court has found that a trial court's refusal to mitigate a defendant's sentence based on prior honorable military service was not error." *State v. Jamison*, No. M2021-01302-CCA-R3-CD, 2022 WL 17324204, at *4 (Tenn. Crim. App. Nov. 29, 2022) (citing *State v. Knight*, No. M2005-00779-CCA-R3-CD, 2006 WL 1491573, at *3 (Term. Crim. App. May 31, 2006)), *no perm. app. filed*.

The record reflects that defense counsel argued for multiple mitigating factors and that the trial court found only one factor applicable: The Defendant committed the offenses under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his criminal conduct. As we stated previously, the trial court is not bound by any applicable enhancement or mitigating factors when imposing a sentence, and we will not disturb a trial court's sentencing decision unless the court wholly departed from the purposes and principles of the Sentencing Act. *See Bise*, 380 S.W.3d at 706. Accordingly, we conclude that the Defendant is not entitled to relief.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

s/ JOHN W. CAMPBELL
JOHN W. CAMPBELL, SR., JUDGE